%JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EDWARD R. KOLLER, III, on behalf of himself and all others similarly situated, New York, New York

**DEFENDANTS**

URBAN OUTFITTERS, INC. GLEN T. SENK & ERIC ARTZ, 5000 Broad St., Phila. PA 19107

**(b)** County of Residence of First Listed Plaintiff   New York County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Philadelphia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Levin Fishbein Sedran & Berman, 510 Walnut St., Phila., PA 19106

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity):**
15 USC, sec. 78(b), 78t(a)

Brief description of cause:
Securities Class Action

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
03/31/2011

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: ___New York, New York___

Address of Defendant: ___5000 Broad St., Phila., PA.  19107___

Place of Accident, Incident or Transaction: ___Phila., PA___
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes ☐   No ☒

Does this case involve multidistrict litigation possibilities?     Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☒ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, ___Austin Cohen___, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: __3/31/11__     ___Austin Cohen___     __78977__
                      Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __3/31/11__     ___Austin Cohen___     __78977__
                      Attorney-at-Law            Attorney I.D.#

CIV. 609 (6/08)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| EDWARD R. KOLLER, III, on behalf of himself and all other similarly situated        v. | : : : | CIVIL ACTION |
| URBAN OUTFITTERS, INC., ET AL. | : : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                          (xx)

(f) Standard Management – Cases that do not fall into any one of the other tracks.                 ( )

| | | |
|---|---|---|
| 3/31/11 | _[signature]_ | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-592-1500 | 215-592-4663 | Acohen  AT  lfsblaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD R. KOLLER, III, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>URBAN OUTFITTERS, INC., GLEN T. SENK, and ERIC ARTZ,<br><br>Defendants. | CASE NO. _____<br><br><u>JURY TRIAL DEMANDED</u> |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, Edward R. Koller, III, by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Urban Outfitters, Inc. ("Urban Outfitters" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, and publicly available trading data relating to the price and volume of Urban Outfitters common stock.

## I.    **INTRODUCTION**

1.    This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all persons who purchased the publicly traded common stock of Urban Outfitters between

November 15, 2010 and March 7, 2011, inclusive (the "Class Period") to recover damages caused to the Class by defendants' violations of the securities laws.

2.     On November 15, 2010, the beginning of the Class Period, for the quarter ended October 31, 2010, Urban Outfitters reported growth in net sales of 13% to $574 million and an increase in net income of 17% to $73 million or $0.43 per diluted share.

3.     Also on November 15, 2010, on a conference call with investors, Defendants discussed an emerging shift in fashion trends that Defendants represented was an opportunity for the Company.  Further, Defendants reassured investors that the Company would be able to manage the trend and that the Company had effective inventory management controls and systems.

4.     For example, on November 15, 2010 Defendant Senk stated, in part, the following:

> There's been a considerable amount of discussion around the current fashion shift which I first referenced during our previous call. Rather than dissect the fashion itself, which I will not do because of competitive factors, let me discuss how we intend to respond to this change, or better put, this opportunity. Fashion cycles are good for our business. We are early adopter merchants selling to early adopter customers. In fact, the ability to recognize change before the market at large has been one of our Company's defining competencies, playing a key role in how we've grown our customer base, become a trusted source for fashion and remain relevant throughout our 40 year history. And while it's true that customers may pull back on spending during a period of fashion transition until they're confident with new trends, *we have more tools and I believe a more rigorous approach to managing these cycles than in years past.*
>
> What's different?
>
> *We have our direct-to-consumer business which helps us to assess, test, and size trends with a quantitative, fact-based approach. We have planning and allocation systems and methodologies which allow us to control and accurately balance our inventory and on order against trends in the business. And we have our nimble supply chain, where a significantly compressed calendar enables us to adapt to change with*

*ever increasing flexibility and speed. It's these tools that support our goal of navigating through fashion cycles while delivering a relatively consistent financial performance and simultaneously gaining market share.*

(Emphasis added).

5.     Further, during the Class Period, Defendants represented that Urban Outfitters inventory would "grow more in-line with sales growth."

6.     Defendants' representations convinced investors that the Company was well positioned to take advantage of the shift in fashion trends.   For example, a November 16, 2010 analyst report from *Roth Capital Partners* stated, in part, that "[a]lthough there is some near-term sourcing pressure, we believe URBN's sophisticated supply chain, its design driven product and its long standing vendor relationships should help offset some of this pressure. Moreover, we believe recent IT initiatives such as Merkle, Tradestone and Sterling will drive further productivity improvements and ultimately lead to higher margins."

7.     Further, a November 23, 2010 *J.P. Morgan* report stated, in part, that

Given the company's recent comments about a "fashion shift" at Anthro, investors were looking back to 2006 when the "big over little" shift resulted in a 600-bp margin compression.   We do think URBN is a different company today, with the new planning and allocation tools and over 50% still open to buy for 1Q11 giving the company some flexibility to react to changing trends to hopefully minimize gross margin pressure on top of a tough 1H10.

8.     A December 6, 2010 *Wall Street Strategies, Inc.* report stated that "management has gotten a handle on the shift in fashion that has been mentioned on the last two earnings call.   We reiterate our Buy rating and $43.00 price target."

9.     But, by the beginning of the Class Period, Defendants knew, or were at least reckless in not knowing, that the Company was not managing the shift in fashion

trends.   In fact, Defendants knew or had reason to know (1) that the Company's inventories were increasing materially more than sales, (2) that sales at the Company's namesake *Urban Outfitters* store and *Anthropologie* division were materially declining due to lack of customer demand, especially for women's apparel, and (3) as a result, the Company was forced to mark down the price of inventory which materially adversely affected the Company's margins and financial results for the quarter ended January 31, 2011.

10.   On March 7, 2011, investors in Urban Outfitters' stock learned the truth about the Company when, after the close of trading, Defendants disclosed the Company's financial results for the quarter ended January 31, 2011. Among other things, the Company disclosed: i) earnings of $75 million or $0.45 per share for the fourth quarter, which was approximately 13% less than the $0.52 per share expected by analysts; ii) that gross profit margin materially declined, primarily due to increased merchandise markdowns to clear seasonal inventory associated with changing women's apparel fashion trends; and iii) retail inventories increased by 10% at cost while total comparable store inventory increased by 4% at cost and total inventories grew by $43 million or 23%, on a year-over-year basis.

11.   After the Company's March 7 disclosure, an analyst at *Goldman Sachs* observed "[t]he gross margin was down 208 bp due mainly to markdowns to clear fashion that did not resonate. Inventories grew faster than sales (total inventory +23% and comp retail including e-commerce +10%), and management warned that the gross margin could be under greater pressure in 1H11 as fashion issues linger and compares get tougher." Further *Piper Jaffray* stated, in part, that "we remain on the sidelines for now, as

4

operating margin gains will likely be limited by slower sales, thus weighing on earnings growth."

12.     On March 8, 2011, Urban Outfitters shares declined from a close on March 7, 2011 of $37.99 per share, to close at $31.66 per share, a decline of $6.33 per share, or approximately 17%, on heavier than usual volume.

13.     Also on March 8, 2011, several analysts issued reports concerning the Company's financial results.

14.     A *Morgan Stanley* report titled *Urban Outfitters, Inc., Compelling L-T; Still Working through Fashion Shift* stated, in part, "Higher markdowns and elevated inventory surprise:  A lower 1H11 gross margin outlook could drive a ~10% correction in consensus estimates and URBN's share price in our view. 4Q results demonstrate that the timing of sales acceleration is still unclear . . . . Clearance Rack (negatives): 1) 1H11 gross margins could decline by a similar or greater rate as 4Q, driven by higher markdowns to clear inventory associated with changing fashion trends . . . 23% total inventory growth exceeds 13% 1Qe sales growth."

15.     An analyst at *Seeking Alpha* stated, in part, the following:

**Q3   2010's   Bloated   Inventory   Was   Not   an   Anomaly**
We're amazed that URBN management seemingly forgot what they told the investment community at the *ICR Conference* in mid-January 2011 re: inventory. At that time, CEO Glen Senk suggested that Q3 2010's bloated inventory was an anomaly. During a well attended break-out session, he clearly said that at the end of Q4 2010 inventory would "grow more in-line with sales growth."

This was approximately 2 weeks prior to the end of the fiscal quarter. When he made the above statement, the company's CFO and IR rep jumped in to add additional color to support Mr. Senk's suggestion that Q3 2010's inventory was an anomalous "point in time" issue. This does not reflect well on the company's senior management.

5

To suggest on the Q4 2010 conference call that bloated inventory at the end of Q4 2010 was a result of January sales weakness at *Urban* and unforeseen in-transit inventory is simply weak.

16.     Further, an analyst at *Wall Street Strategies* stated, in part, the following:

It has been clear to us that Urban Outfitters (URBN) is having difficulty incorporating the evolution in women's fashion at the namesake and Anthropologie divisions . . . . The female shopper to Urban Outfitters and Anthropologie is delving into accessories and home furnishing, which drove 4Q11 divisional comps, but scurrying away from the apparel section seeing it as off trend (apparel was missing in action as a driver in the quarter).  We have talked to numerous fashion minds all of which can't specifically identify the trend Urban Outfitters is referencing to in terms of fashion shift . . . . Suffice it to say we expect multiple contraction as margin trajectory is down perhaps for three consecutive quarters, factoring in too much inventory entering 1Q12, fashion risk, and stepped up investment spending to support international and direct to consumer initiatives.

## II.     JURISDICTION AND VENUE

17.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.  Venue is proper pursuant to Section 27 of Exchange Act because during the Class Period defendant Urban Outfitters and/or the Individual Defendants conducted business in and wrongful conduct took place in this District.

## III.     THE PARTIES

18.     Plaintiff, Edward R. Koller, III, an adult individual and resident of New York City, New York, purchased Urban Outfitters' publicly traded common stock as detailed in the attached Certification and was damaged thereby.

19.     Defendant Urban Outfitters is incorporated in Delaware and its current principal executive offices are located at 5000 South Broad Street, Philadelphia, Pennsylvania.

6

20.     Defendant Glen T. Senk ("Senk") was the Company's Chief Executive Officer at all relevant times.

21.     Defendant Eric Artz ("Artz") was the Company's Chief Financial Officer at all relevant times.

22.     Defendants Senk and Artz are referred to as the "Individual Defendants."

23.     Because of their positions with the Company, they possessed the power and authority to control the contents of Urban Outfitters' press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them but not to the public, the Individual Defendants knew or had reason to known that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## IV.     CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the publicly traded common stock of Urban Outfitters during the period from November 15, 2010 through March 7, 2011, inclusive (the "Class").

25.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the

present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, Urban Outfitters had over approximately 164 million shares of common stock outstanding, which were actively traded on the Nasdaq in an efficient market.

26.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.   Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V.     FALSE AND MISLEADING STATEMENTS

29.     The Class Period begins on November 15, 2010, when the Company disclosed its financial results for the quarter ended October 31, 2010.   Defendants reported, among other things that "as of October 31, 2010, total comparable retail segment inventories (which includes our direct-to-customer channel) increased by 8% at cost while total comparable store inventory increased by 1% at cost.   Total inventories grew by $55 million or 24%, on a year-over-year basis, driven primarily by the acquisition of inventory to stock new retail stores."

30.     On November 15, 2010, the Company conducted a conference call with investors during which the following representations were made:

**Eric Artz** - *Urban Outfitters - CFO*

I'd like to now turn your attention to the fourth quarter. We believe we are well positioned as we head into the holiday season, and while we will not provide specific guidance, it will be helpful for you to consider the following. We began the fourth quarter with an appropriate level of inventory liquidity providing us the continuing ability to respond to shifting consumer and fashion trends. We are planning for fourth quarter comparable store sales performance to be consistent with third quarter results coupled with continued strong direct growth. We project to open 16 new stores in the fourth quarter. We anticipate a sequential improvement in operating margin from the third quarter to the fourth quarter similar to last year.

*       *       *

9

**Glen Senk** - *Urban Outfitters – CEO*

There's been a considerable amount of discussion around the current fashion shift which I first referenced during our previous call. Rather than dissect the fashion itself, which I will not do because of competitive factors, let me discuss how we intend to respond to this change, or better put, this opportunity. Fashion cycles are good for our business. We are early adopter merchants selling to early adopter customers. In fact, the ability to recognize change before the market at large has been one of our Company's defining competencies, playing a key role in how we've grown our customer base, become a trusted source for fashion and remain relevant throughout our 40 year history. And while it's true that customers may pull back on spending during a period of fashion transition until they're confident with new trends, we have more tools and I believe a more rigorous approach to managing these cycles than in years past.

What's different?

We have our direct-to-consumer business which helps us to assess, test, and size trends with a quantitative, fact-based approach. We have planning and allocation systems and methodologies which allow us to control and accurately balance our inventory and on order against trends in the business. And we have our nimble supply chain, where a significantly compressed calendar enables us to adapt to change with ever increasing flexibility and speed. It's these tools that support our goal of navigating through fashion cycles while delivering a relatively consistent financial performance and simultaneously gaining market share . . . . Our results always are a reflection of the team's dedication, discipline, creativity and skill. No matter the external circumstances, our people adroitly manage that which they can control and as a result, they are consistent in their deliverance of superior results.

*       *       *

**Kimberly Greenberger** - *Morgan Stanley – Analyst*

Great. Thank you, good evening. Glen? I was hoping you could talk about -- Glen or Eric, the liquidity in the inventory, how you're approaching the fourth quarter. It looked to me like the total inventory growth year-over-year was around 23%, which looks to be growing a little bit faster than your total sales growth. Is it just recent receipts are higher in transit? How should we think about that?

**Glen Senk** - *Urban Outfitters – CEO*

Kimberly, let me remind everyone of a couple of facts. Last year, the retail inventories were down 14%, so this year, the retail only inventory is up 1% against the down 14%. Last year, the total inventories were down around 11%, so on a two year basis, we're still down 3%. The other thing to remember is we have 11 more stores opening in the second half this year than we did a year ago. In fact, we have 16 stores opening in the fourth quarter, 14 of which opened either this month or the first week in November. So, as I've said repeatedly over the years, we plan for weeks of supply. I feel very comfortable with our inventory. Our FIFO is virtually identical to a year ago. I looked this morning, we have a considerable amount of open to buy for the first quarter, more than 50% open to buy for the first quarter, so I feel very, very good with the way the group has managed their inventories and the way we're going into the fourth quarter.

\*　　\*　　\*

**Anna Andreeva** - *JPMorgan – Analyst*

Great, thanks so much. It's Anna Andreeva for Brian. Glen or Eric, I was wondering if you could talk about the markdown opportunity in the business. In the past, I think you've talked about being 200 to 300 basis points away from historical levels. Maybe talk about markdown opportunity in terms of gross margin for the fourth quarter and into next year, and how do you feel about the level of markdowns in 3Q?

**Glen Senk** - *Urban Outfitters – CEO*

As we have said in our prepared comments, the merchandise margins this year were relatively flat to last year. In terms of the markdowns, I won't comment on what I expect them to be in the fourth quarter, but I will say going forward that I do believe that there are several hundred basis points of opportunity. And when I say that, I mean over the next several years. *As we said in our prepared comments, we're making a myriad of investments in systems, many of which I think will help us to reduce markdowns.*

\*　　\*　　\*

**Lorraine Hutchinson** - *BofA Merrill Lynch – Analyst*

Thank you. Good afternoon. Last quarter you spoke about bringing in some new fashion items throughout the quarter. What was the reaction to some of the newer pieces, and do you think that caused the increase in the comp performance from September to October?

**Glen Senk** - *Urban Outfitters – CEO*

Lorraine, I think most of you know that one of the wonderful things about
our Company and all of our brands is that we receive multiple times a
week 52 weeks a year, so we don't have a floor set. We have an inventory
that changes quite quickly. And most of you also know we're pretty
ruthless. When we buy something and it doesn't sell to expectation, we
move it out quickly so that we constantly work to get high test fuel into
our stores. So yes, I think that the improvement that we saw from
September to October in part related to the quality of the inventory
content. Some of the new product hit and didn't do well, a good amount of
it hit and did quite well. So, as a merchant, what I and all of the merchants
in the organization look for is that they look for inventory that hit and
turns quickly. So, they look for an immediate reaction. Our stores are so
heavily trafficked that we can deliver something and literally within 24
hours, 36 hours, we know what we have on our hands. And I want to
sound positive on this call because we have clear direction what people
want.

31.    On November 17, 2010, Defendants Senk and Artz participated in a

*Morgan Stanley Global Consumer & Retail Conference*.    At the conference, the

following representations were made:

**Kimberly Greenberger** - *Morgan Stanley – Analyst*

Great. Part of achieving your financial goals and part of risk management
is obviously managing inventory. And I think Urban Outfitters approaches
inventory management in quite a unique way. Maybe you can talk about
your approach and why you think it works for your organization.

**Glen Senk** - *Urban Outfitters – CEO*

I think -- the way that I try to explain it to you all is that we manage
inventory the way you manage your portfolios. So we manage inventory
based on return of investment. And we are constantly maneuvering
inventory into what is productive and maneuvering away from what is not
productive.

And we have a process of pattern recognition in the business. We call
them attributes. So we don't just look at -- much like you wouldn't just
look at stock or companies, you're going to start to slice and dice how you
do your analytics. When I am looking at sweaters, I'm not just looking at
sweaters, I am looking at yarn type, neck type, sleeve length, whether it is

solid, embellished, the length, the price point, obviously, whether it is fashion forward, whether it is more basic. So we have hundreds of attributes, and we can toggle up and toggle down. So we can obviously go right down to the individual SKU, look at a color and a size, but we can keep lifting up so that we can get 50,000 feet up.

And a lot of what we teach our merchants is how to recognize product lifecycles and patterns in the business. And then we teach people and have a supply chain that allows us to maneuver the inventory very, very quickly.

I think there is constant confusion. We do not plan comp inventory levels, we plan inventory weeks of supply. So that in years -- and you have covered us for a while, Kimberly -- I think there was one year when the Company was 26% comp. And people couldn't understand how we could continue to fuel that inventory. It is because we adjust our inventories on a weekly basis.

Conversely, when you look at the downturn in 2008 it hit us later than most people, but it certainly hit us. In October of 2008 we right-sized our inventory in the fourth quarter. The other thing, and those of you who follow us know this, is we are not afraid to take markdowns. So if we make a mistake, we deal with it quickly. I would guess that the nature of our inventory is much more current than most of the other retailers. You know, other than some categories like denim, the vast majority of our inventory is 12 weeks or fresher.

32.     On December 9, 2010, Defendants participated in the *NASDAQ OMX London Investor Program*. During the conference, Defendants made the following representations:

**Glen T. Senk, *Chief Executive Officer***

We have tremendous discipline around inventory management.

\*          \*          \*

**Unidentified Audience Member**
From the format of your stores, I wonder how you control shrink, because you've got a lot of high-priced items that are scattered all over the place.

13

**Glen Senk** - *Urban Outfitters - CEO*

As you get to know -- if you get to know our company, you'll realize that, as creative as we are, that is also how controlled we are. So actually we don't give specific shrink numbers, but I will tell you that we have the lowest shrink in the industry.

How do we do that? We have tremendous discipline around floor awareness. We have tremendous discipline around cycle counts. So we take a mini-inventory literally every week for probably 10.5, 11 months of the year. If there is -- those cycle counts are very predictive. If there's going to be a shrink issue, and if there is a shrink issue or a perceived shrink issue, we're all over it.

It's just it -- the stores have a very heightened awareness of where everything is, who is touching what. We have fulfillment center. I think we have 99.8% accuracy of pick and pull, so it's something we look at literally on a weekly basis.

33.    On December 10, 2010, Defendants filed the Company's quarterly report

for the quarter ended October 31, 2010 with the SEC on Form 10-Q (the "Q3 10-Q").

The Q3 10-Q, which was signed by Defendants Senk and Artz, stated, in part, the

following:

Although we have no precise empirical data as it relates to customer traffic or customer conversion rates in our stores, we believe that, based only on our observations, changes in transaction volume, as discussed in our results of operations, may correlate to changes in customer traffic. Transaction volume changes may be caused by response to our brands' fashion offerings, our web advertising, circulation of our catalogs and an overall growth in brand recognition as we expand out store base.

34.    On January 6, 2011, the Company issued a press release announcing its

sales results for the two months ended December 31, 2010, which stated, in part, the

following:

**Urban Outfitters Reports Holiday Sales Up 15%**

PHILADELPHIA, Jan 6, 2011 (GlobeNewswire via COMTEX) -- Urban Outfitters, Inc. (Nasdaq:URBN), a leading lifestyle specialty retail company operating under the Anthropologie, Free People, Leifsdottir,

14

Terrain and Urban Outfitters brands, today announced record net sales for the two months ended December 31, 2010.Total Company net sales for the two months increased to $520 million or 15% over the same period last year. Comparable retail segment net sales, which include our direct-to-consumer channels, increased 5% while comparable store net sales were flat. Comparable retail segment net sales increased 3% at Anthropologie, 30% at Free People and 6% at Urban Outfitters. Direct-to-consumer sales rose 28% for the period with all brands posting double digit growth. Wholesale segment sales jumped 32%.

"We are pleased to announce record sales through the Holiday period," said Glen T. Senk, Chief Executive Officer. "Our solid performance is a result of our team's continued focus and superior execution," finished Mr. Senk.

35.    On January 13, 2011, at the *OCR XChange Conference,* the following exchange took place between Senk and a research analyst:

**Samantha Panella, Analyst, Raymond James**

Okay, on recent conference calls, certainly there's been discussion about a fashion shift. So rather than, I know you don't like to discuss the exact fashion, but how is this difference versus 2006? What did you learn then, how can you navigate through this differently? And then also, what are the opportunities for you with such a shift?

**Glen T. Senk, Chief Executive Officer . . . .**

I think that we were in the throes of it in the third quarter and I couldn't have been move proud of the way that the organization managed the inventory, the margin, the expenses, the sales line. Quite frankly, if that's as worse as it's going to get in the midst of a fashion shift, I think it was that probably we had the best quarter in our peer group in terms of sales and ROS.  So I think the difference between today and 2006, is we're a very different organization from an inventory management, attribute management, supply chain, system point of view.

I actually, change can be frightening, because we all like certainty, but the reality is there is no certainty in life, the certainty comes from being nimble and agile and disciplined . . . .

15

36.     Also on January 13, 2011, at a breakout session at the *OCR XChange Conference*, Senk reportedly stated that Q4 2010 inventory would "grow more in-line with sales growth."

37.     The statements referenced above in ¶¶ 29-37 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which Defendants knew or had reason to know: (1) that inventories were increasing materially more than sales, (2) that sales at the Company's namesake *Urban Outfitters* store and *Anthropologie* division were materially declining due to lack of customer demand, especially for women's apparel, and (3) as a result, the Company was forced to mark down the price of inventory which materially adversely affected the Company's margins and financial results for the quarter ended January 31, 2011.

## VI.     THE TRUTH BEGINS TO EMERGE

38.     On March 7, 2011, after the close of trading, Urban Outfitters disclosed its financial results for the quarter ended January 31, 2011 as alleged in detail above.

39.     On March 8, 2011, Urban Outfitters shares declined from a close on March 7, 2011 of $37.99 per share, to close at $31.66 per share, a decline of $6.33 per share or approximately 17% on heavier than usual volume.

## VII.     LOSS CAUSATION/ECONOMIC LOSS

40.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Urban Outfitters stock price and operated as a fraud or deceit on Class Period purchasers of Urban Outfitters stock by misrepresenting the Company's operating condition and future business prospects. Defendants achieved this by making positive statements about Urban

Outfitters' business and projecting strong earnings for the Company while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as alleged herein. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Urban Outfitters stock fell precipitously as the prior artificial inflation came out of Urban Outfitters' stock price. As a result of their purchases of Urban Outfitters stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

41. As a direct result of the public revelations regarding the truth about the condition of Urban Outfitters' business and the negative adverse factors that had been impacting Urban Outfitters' business during the Class Period, the price of Urban Outfitters' stock materially declined.   This drop removed the inflation from Urban Outfitters' stock price, causing real economic loss to investors who purchased the stock during the Class Period.

42. The decline in Urban Outfitters' stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Urban Outfitters' stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

43. At all relevant times, the market for Urban Outfitters' common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)     The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

44.     As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Urban Outfitters from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Urban Outfitters at artificially inflated prices and a presumption of reliance applies.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

45.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issues or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Urban Outfitters, their control over, and/or receipt and/or modification of

Urban Outfitters' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Urban Outfitters, participated in the fraudulent scheme alleged herein.

46.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

47.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Urban Outfitters, issued statements and press releases on behalf of Urban Outfitters and had the opportunity to commit the fraud alleged herein.

## X.     NO SAFE HARBOR

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements

19

was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Urban Outfitters who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF
### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

49.    Plaintiff incorporates ¶¶ 1-48 by reference.

50.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Urban Outfitters publicly traded common stock during the Class Period.

52.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Urban Outfitters' publicly

traded common stock. Plaintiff and the Class would not have purchased Urban Outfitters common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

53.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Urban Outfitters common stock during the Class Period.

### SECOND CLAIM FOR RELIEF
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

54.     Plaintiff incorporates ¶¶ 1-48 by reference.

55.     Each Individual Defendant acted as a controlling person of Urban Outfitters within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.    As set forth above, Urban Outfitters and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Urban Outfitters' and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 31, 2011

_Howard J. Sedran_ /@

LEVIN FISHBEIN SEDRAN & BERMAN
Howard J. Sedran
Austin B. Cohen
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Tel:  (215) 592-1500
Fax: (215) 592-4663

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for Plaintiff*

## CERTIFICATION

I, Edward R. Koller, III, hereby state and swear as follows:

1. I have reviewed a complaint against Urban Outfitters, Inc. alleging violations of the securities laws;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter:

4. The following is a description of my transactions in the common stock of Urban Outfitters, Inc. during the period alleged in the complaint:

**Account 1**

| Transaction Type | Transaction Date | No. of Shares | Share Price |
|---|---|---|---|
| Purchase | 11/18/2010 | 150 | $37.04 |
| Purchase | 1/10/2011 | 75 | $36.10 |

**Account 2**

| Transaction Type | Transaction Date | No. of Shares | Share Price |
|---|---|---|---|
| Purchase | 11/18/2010 | 25 | $37.04 |

5. I did not purchase stock of Urban Outfitters, Inc. at the direction of my counsel or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

*Edward R. Koller III*

EDWARD R. KOLLER, III

Date: March 31, 2011